**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

KEVIN LAMAR BLAKE,

Plaintiff,

v. Case No. 3:23-cv-399-BJD-MCR

E.S. YOUNG, et al.,

Defendants.

---

**ORDER**

**I. Status**

Plaintiff, Kevin Lamar Blake, a prisoner of the Florida Department of Corrections (FDOC), is proceeding under 42 U.S.C. § 1983 on a Second Amended Complaint (Doc. 19, 19-1) against nine Defendants: (1) Lieutenant Young; (2) Captain Covey; (3) Officer Shamp; (4) Sergeant Allen; (5) Sergeant Reagor; (6) Sergeant Fowler; (7) Officer Price; (8) Officer Carlan; and (9) Sergeant Lingold (formally a "Doe Defendant"). Plaintiff asserts Defendants committed a series of constitutional violations by using excessive force and failing to intervene during a cell extraction and decontamination shower.

Before the Court is a Defendants Young, Covey, Shamp, Allen, Reagor, Fowler, Price, and Carlan's Motion for Summary Judgment (Doc. 57), with exhibits (Doc. 57-1 through 57-10). Plaintiff responded (Doc. 69), with exhibits

(Doc. 69-1). Defendants replied (Doc. 70). In accordance with the procedure set for in Rule 56(f)(1), and in light of Defendant Lingold's adoption of the Motion for Summary Judgment (Doc. 80) and Plaintiff's Response thereto (Doc. 81), the Court will assess the merits of Lingold's entitlement to summary judgment and dismiss as moot his Motion to Dismiss (Doc. 62). *See* Order (Doc. 79).

## II. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on

a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. *Id.* Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III. Motion & Evidence

In their Motion, Defendants argue the following: (1) Plaintiff cannot prove his excessive force or failure to intervene claims; (2) Plaintiff cannot recover compensatory damages because he fails to allege more than *de minimis* injuries; (3) they are entitled to qualified immunity; and (4) Plaintiff cannot recover punitive damages. *See generally* Doc. 57. As evidence, they provide video footage filed under seal (Docs. 57-1, 58), a disciplinary report (Doc. 57-2);

medical records (Docs. 57-3, 57-4, 57-5), use-of-force reports (Doc. 57-6), Plaintiff's deposition transcript (Doc. 57-7), and declarations from Defendants Covey and Carlan (Docs. 57-9, 57-10). With his Response, Plaintiff relies on the same evidence (Docs. 69, 69-1).

The allegations in Plaintiff's Second Amended Complaint are summarized in the Court's Order on Defendants' Motion to Dismiss and Supplemental Motion to Dismiss. *See* Doc. 35 at 3-4. At the outset, however, the Court finds that, to the extent Plaintiff intended to raise excessive force and failure to intervene claims against Defendants Young and Price based on their involvement in the use of chemical agents, such claims are deemed abandoned. In Plaintiff's sworn deposition, which the Court summarizes later in this Order, he expressly testified he was not complaining about "the spraying" because he was admittedly noncompliant with officers' orders, such that their use of chemical agents was not "wrong." Doc. 57-7 at 44. Further, Plaintiff testified that "the only reason for this case" is because Defendants "physically abused [him] repeatedly" during the cell extraction and decontamination shower, not because of the use of chemical agents and a cell extraction team (CET). *Id.* at 62-63. Plaintiff's sworn testimony makes it abundantly clear that, in this action, he seeks redress only as it relates to Defendants' alleged use of excessive force or failure to intervene during the cell extraction and decontamination shower. Moreover, in Plaintiff's Response, he

focuses exclusively on the alleged use of excessive force during the cell extraction and decontamination shower. *See generally* Doc. 69. Regardless, as discussed below, given the consistent and uncontradicted evidence that Plaintiff was creating a disturbance and refusing to comply with several lawful orders, the use of chemical agents and a CET were reasonable efforts taken to maintain or restore discipline. *See Thomas v. Bryant*, 614 F.3d 1288, 1310 (11th Cir. 2010) ("[I]t is well-established that the use of chemical agents on recalcitrant prisoners is not per se unconstitutional[.]" (citations omitted)); *see also Sconiers v. Lockhart*, 946 F.3d 1256, 1264 (11th Cir. 2020) (acknowledging "pepper-spray" may be used to subdue an inmate when penologically necessary); *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) ("Pepper spray is an accepted non-lethal means of controlling unruly inmates."), *overruled on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010).

Defendants' version of events is consistent, as relayed through their use-of-force reports and declarations. According to those reports, on November 14, 2022, at approximately 4:00 p.m., Plaintiff was creating a disturbance in the E-Wing by yelling out of his cell and refusing to relinquish the handcuffing aperture. Doc. 57-6 at 11-12. After Plaintiff refused several orders to cease creating such disturbance, and following unsuccessful crisis intervention techniques (CITs), Lieutenant Daniel Philbert administered two applications

of OC chemical agents and one application of CS chemical agents through the chain-breached cell door and handcuffing aperture.[1] *Id.* at 11-12, 18, 20. Plaintiff blocked the chemical agents using his state-issued blanket. *Id.* at 11-12, 20.

After each application of chemical agents, Plaintiff continued to obstruct the handcuffing aperture and refused to submit to restraint procedures for a decontamination shower. *Id.* at 24-26. Additional CITs were conducted by medical staff, but Plaintiff continued to refuse all orders. *Id.* As such, the use of a CET was authorized to bring Plaintiff into compliance. *Id.*

At approximately 5:03 p.m., the CET formed outside of Plaintiff's cell, which included Defendants Shamp, Fowler, Reagor, Allen, and Lingold. *Id.* at 13-18. According to their use-of-force reports, they entered Plaintiff's cell with Defendant Shamp leading the way with his protective shield. *Id.* at 13-17. Shamp attempted to pin Plaintiff against the back wall of the cell while the other CET Defendants attempted to restrain Plaintiff, but Plaintiff became physically resistant and combative. *Id.* Plaintiff was then forced onto the bunk,

[1] OC chemical agent is "the primary chemical agent to be utilized for cell extractions and other in-cell uses" and is defined as "[a]n inflammatory agent that causes tearing and involuntary closing of the eyes, nasal discharge, sneezing, disorientation, and the sensation of respiratory distress[.]" Fla. Admin. Code r. 33-602.210(1)(r). CS chemical agent is "[a]n irritant agent that causes a burning sensation and tearing of the eyes, nasal discharge, and skin and upper respiratory irritation" and may be used during cell extractions if OC chemical agents prove ineffective in obtaining compliance. Fla. Admin. Code r. 33-602.210(1)(e), (5)(a)3.a.

but Plaintiff acquired a grasp of the bunk with both hands, preventing the CET from placing him in a prone position and applying restraints. *Id.* Thus, Defendant Reagor utilized "several palm heel and hammer fist strikes to [Plaintiff's] outer forearms" to get Plaintiff to release his grasp of the bunk. *Id.* When Plaintiff released his grasp, the CET forced him to the ground in a prone position; while doing so, Plaintiff's head "struck the writing desk and then the floor."[2] *Id.* at 13.

Once the CET gained control of Plaintiff on the floor, Defendant Shamp placed his hands on Plaintiff's back and used his body weight to keep Plaintiff pinned down, Defendant Fowler forced Plaintiff's left arm behind his back, Defendant Reagor applied hand restraints, Defendant Allen acquired a grasp of Plaintiff's legs, and Defendant Lingold applied leg restraints. *Id.* at 13-17. Once all restraints were applied, all force ceased. *Id.* Plaintiff was assisted to his feet by Defendants Reagor and Shamp who then escorted Plaintiff to a decontamination shower. *Id.* Shamp and Reagor maintained a grasp of Plaintiff's arms while he received a decontamination shower. *Id.* Following the shower, Plaintiff was escorted to medical for a post use-of-force examination.

[2] The CET Defendants' use-of-force reports differ as to which side of Plaintiff's head struck the writing desk and floor upon forcing him to the ground. Defendant Shamp reported it was the left side of Plaintiff's head while the other four CET Defendants reported it was the right side. Doc. 57-6 at 13-17. Medical records indicate Plaintiff had lacerations on both sides of his face around his eyes. Doc. 57-3 at 2-4.

*Id.* Based on these events, Defendant Young issued a disciplinary report against Plaintiff (Log # 205-222188) for disobeying a verbal or written order. Doc. 57-2 at 1-10.

Defendants Covey and Carlan aver in their declarations that they did not witness any excessive use of force by any officer during the cell extraction. Docs. 57-9, 57-10. Specifically, Covey states he observed Plaintiff take "an offensive position" against the CET upon their entry into the cell but that from his vantage point (just outside the cell door), he "could not see [Plaintiff's] hands to determine whether he was complying or not." Doc. 57-9 at 1-2. Covey asserts he would have intervened had he seen "anything concerning or unjustified." *Id.* As for Carlan, he states he "recall[ed]" Plaintiff fighting the CET once they entered the cell. Doc. 57-10 at 1-2.

In his sworn deposition, Plaintiff testified that on the day of the incident, he was placed on property restriction, and Defendant Price was one of the officers who began taking his property. Doc. 57-7 at 17. While in his cell, Plaintiff "held the flap" open to get the dorm sergeant or lieutenant to come to his cell and provide an explanation for why he was being placed on property restriction. *Id.* at 25. Plaintiff admitted he was disobeying officers' orders to remove his arm from the flap, which led to the use of chemical agents. *Id.* 25-28.

Plaintiff testified that after the use of chemical agents, a five-man CET was formed, and they "came in and beat [him] up." *Id.* at 36-37. He explained as follows:

> They came in. I was back – they backed me up against the wall. Well, they couldn't really back me up against the wall because it's a desk – it's a desk, sit at the back window, and it's like a little bar in the cell where you put your towel and your rag and your toilet paper roll, okay. Right there's the corner. They backed me up into the corner with the shield, and as they moved the shield to the side, they kind of, like, grabbed me and shoved me onto the bunk. When I landed on the bunk, I was actually on top of the shield, and as I landed on top of the shield, I was struck several times in my face, all over my body, all over my head.
>
> Afterwards, they kept telling me to stop resisting. I kept screaming to them, I'm not resisting – I'm not resisting. Then they told me, "Put your hands behind your back." I told them – I say, "I – I'm trying to put my hands behind my back, y'all aren't letting me put my hands behind my back." That's when they rolled me from the – off the – off the shield onto the – onto the ground. …. Sergeant Fowler was on my right side and Sergeant Shamp was on my left side. Sergeant – while I was screaming for them to stop hitting me, for – that I was trying to put my hands behind my back and that I wasn't resisting, while I was screaming this, Sergeant Shamp started choking me, and Sergeant Fowler grabbed me by my head and started smashing my face into the ground until my – until my left eye split open. And then, then that's when I heard – heard Young telling them, stop, stop or get him out – get him up – get him up.

*Id.* at 39-41.

Plaintiff testified that during the decontamination shower, Defendants Shamp and Reagor continued to beat him, while Defendant Lingold sprayed water "directly in [his] mouth," causing a drowning sensation and an inability to breathe. *Id.* at 41-42. Specifically, Plaintiff stated Shamp choked him and Reagor "smash[ed] [his] head into the wall[.]" *Id.* at 41-42. Plaintiff testified Defendant Young stood by and allowed the officers to do so. *Id.* at 42. When Young announced that Plaintiff had another minute to shower and asked if he wanted to continue, Plaintiff declined because "the whole time [he] was in the decontamination shower, they continued to choke [him] and smash [his] face into the wall." *Id.* Plaintiff testified that, after the incident, he began experiencing migraines and blurred vision, and stated he has a scar "in his left eyelid." *Id.* at 49-50. Although, he acknowledged his vision is "good" and that he does not require eyeglasses. *Id.* at 51.

Defendants submitted four videos in support of their Motion: two hand-held camera videos and two fixed-wing videos. Docs. 57-1, 58.[3] The hand-held camera video that initiates the recording process shows only what occurred

[3] The two videos from the fixed-wing cameras, both forty-five minutes in length, record the incident from a distance and do not capture the inside of Plaintiff's cell or decontamination shower area. As such, the Court will summarize only the video footage recorded by the hand-held camera. The Court will cite to the two hand-held video exhibits separately as "HH-1" and "HH-2." For clarity, the hand-held video exhibits are labeled "Handheld video 1" (which records the cell extraction and decontamination shower) and "Handheld video 2" (which records the events preceding the cell extraction and decontamination shower). Doc. 57-1.

before the CET entered the cell. *See generally* HH-2. In the next hand-held camera video, the five-man CET introduces themselves and states their responsibilities as follows: Defendant Shamp, responsible for the protective shield; Defendants Fowler and Reagor, responsible for securing Plaintiff's upper extremities and applying hand restraints; and Defendants Allen and Lingold, responsible for securing Plaintiff's lower extremities and applying leg irons. HH-1 at 0:01:38-0:02:36. The CET assembles in front of Plaintiff's cell while Defendants Young and Covey stand by the cell door; Young announces that Plaintiff is now naked inside his cell. *Id.* at 0:02:38-0:02:50. Young gives Plaintiff a final order to submit to restraint procedures for a decontamination shower, but Plaintiff refuses to comply. *Id.* at 0:02:56-0:03:25.

Before the CET enters the cell, Plaintiff is seen through the window standing and facing the cell door. *Id.* at 0:03:26-0:03:31. Defendant Young opens the cell door, the CET enters, and Plaintiff moves backward as Defendant Shamp moves forward with his protective shield. *Id.* at 0:03:32-0:03:37. A physical struggle between Plaintiff and the CET occurs. *Id.* at 0:03:38-0:03:41. What can be seen is that Plaintiff and all five CET Defendants initially move toward the back right side of the cell, Defendant Young stands on the bunk on the left side of the cell, where he observes the events, and Defendant Covey stands outside the cell, also observing. *Id.*

The struggle moves to the left side of the cell, where the CET attempts to place Plaintiff in a prone position on top of the bunk, but Plaintiff places his hands down on the bunk while the team members continue to struggle with him. *Id.* at 0:03:42-0:03:57. During these fifteen seconds, commands are given to "stop resisting" and "get on the ground," and Plaintiff yells, "I'm trying to!" *Id.* Defendant Reagor's right shoulder area begins making punching movements, and a command is given to "let go and put your hands behind your back." *Id.* at 0:03:58-0:04:07.

After approximately twenty-five seconds of the CET struggling with Plaintiff on the bunk, the struggle moves to the ground, and Defendant Young yells, "get him on his stomach." *Id.* at 0:04:08-0:04:12. At this point, because the events are occurring in such a narrow cell and there are several officers present, it is difficult to see the specific, individual movements or actions of each officer or Plaintiff. While the CET and Plaintiff continue to struggle on the ground, the protective shield is removed from the cell, and Plaintiff repeatedly yells, "stop hitting me"; Defendant Young remains standing on the bunk, continuing to observe and provide direction; and Defendant Covey remains at the cell door. *Id.* at 0:04:13-0:04:52. Defendant Young directs the CET to "get his hands behind his back," "grab his hands," and "get the handcuffs on him." *Id.* at 0:04:53-0:05:07. Defendant Young then yells, "get him up." *Id.*

Young exits the cell, the CET bring Plaintiff to his feet, and Covey yells out to someone off camera to bring a blanket, which is subsequently wrapped around Plaintiff, who was naked during the cell extraction. *Id.* at 0:05:13-0:07:19. The CET then escorts Plaintiff out of his cell, and Defendants Shamp and Reagor begin walking him to the decontamination shower; Plaintiff is in hand and leg restraints, he is awake, and his gait is normal. *Id.* at 0:07:20-0:10:40. During this walk, the hand-held camera captures Plaintiff's face, which is bloody on the left side and swollen above his left eye, and Plaintiff announces he was "physically abused" during the cell extraction and hit several times while not resisting; he also names the officers involved. *Id.* In all, approximately two minutes elapsed from the time the CET entered Plaintiff's cell to when Plaintiff is secured and standing upright in his cell surrounded by the officers. *Id.* at 0:03:32-0:05:20.

When they arrive at the shower, Defendants Shamp and Reagor aide Plaintiff into a shower stall with no door and position him (facing forward) behind a privacy wall, out of the camera's view; Shamp and Reagor also step into the shower stall, maintaining their grasp of Plaintiff's arms. *Id.* at 0:10:41-0:10:48. Defendant Lingold positions himself behind Plaintiff, Shamp, and Reagor and begins hosing Plaintiff. *Id.* at 0:10:49-0:11:12. During the decontamination shower, Plaintiff repeatedly yells, "I can't breathe," along with other indiscernible comments; Defendant Young stands by the shower

stall and observes; and Defendants Shamp and Reagor, who are partially in the camera's view, remain calm and still throughout the entirety of the shower. *Id.* at 0:11:13-0:14:20.

Following the decontamination shower, officers assist Plaintiff with putting on a pair of boxers; the hand-held camera captures an anterior/posterior view of Plaintiff's body, which shows the same facial injuries; a spit shield is placed on Plaintiff; and then Shamp, Reagor, and a third officer escort Plaintiff to medical for a post use-of-force exam. *Id.* at 0:14:25-0:20:21. Plaintiff's post use-of-force exam lasts approximately twelve minutes, after which he is escorted to a nearby holding cell where his leg and hand restraints are removed without incident. *Id.* at 0:20:38-0:33:32. The hand-held camera recording of the entire incident began at 4:08 p.m. and concluded at 5:38 p.m.

In her declaration, Kellie Caswell, a legal nurse consultant for the FDOC, provides a summary of Plaintiff's condition and injuries as reported during the post use-of-force exam. Doc. 57-3 at 2-4. Plaintiff was ambulatory, alert, oriented, and responsive; his respirations were even and unlabored, and he was able to walk without difficulty. *Id.* Plaintiff refused to open his eyes for further assessment. *Id.* His injuries included a "superficial abrasion to the right eyebrow approximately 0.25 cm in length" and a "laceration above his left eye approximately 3.5 cm x 0.5 cm x 0.5 cm." *Id.* Plaintiff also had bruising, redness, and swelling to both his eyes. *Id.* He denied any other injuries or

complaints. *Id.* His wounds were cleansed with saline and gauze was applied to his left eye injury. *Id.* Plaintiff subsequently received sutures on his left eyebrow area, and Dermabond was used for the other eye laceration. *Id.*

In the days following the November 14, 2022 incident, Plaintiff submitted sick calls complaining his face and eyes were still swollen; he had bruises on his arms and throat; his neck and jaw were sore; he was experiencing "dizzy spells"; his left eye was "throbbing and irritating him," causing migraines; and his right big toe was in pain. *Id.* During these respective sick call visits, it was documented that Plaintiff was able to open and close his mouth without difficulty; he had clear speech; his gait was steady; he had normal range of motion in his neck; he denied experiencing dizziness and reported that his headaches come and go; he denied vision problems; he had "slight redness to his bilateral sclera"; the pain in his right big toe did not radiate, there was no swelling, and he was able to bear weight. *Id.*

Caswell's declaration also provides that Plaintiff complained of "poor sleep" on several occasions prior to the date of the incident at issue, including once in 2021 and four times in 2022.[4] *Id.* Thus, Caswell asserts "there is no documentation that [Plaintiff] had a scar around his left eye, scars on his arms

---

[4] Plaintiff's alleged injuries include suffering from sleep deprivation due to paranoia. Doc. 19-1 at 5.

and shoulders[,] and loss of sleep due to the UOF [use of force] incident." *Id.* at 4.

## IV. Analysis

The remaining claims before the Court include: (1) excessive force during the cell extraction against Defendants Shamp, Fowler, Reagor, Allen, and Lingold, and the failure to intervene therein against Defendants Young, Covey, and Carlan; and (2) excessive force during the decontamination shower against Defendants Shamp, Reagor, and Lingold, and the failure to intervene therein against Defendant Young. Defendants' primary arguments in support of summary judgment is that Plaintiff cannot prove his excessive force or failure to intervene claims and that they are entitled to qualified immunity. *See generally* Doc. 57.

"In order to receive qualified immunity, [a] public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation omitted). There is no dispute that Defendants were acting within their discretionary duties at the time of the incident. Where, as here, it is undisputed that Defendants were acting within the scope of their discretionary authority, the burden shifts to Plaintiff to prove that Defendants "(1) violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370

F.3d 1252, 1264 (11th Cir. 2004). Plaintiff must satisfy both prongs to survive a qualified-immunity defense. *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019).

The Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification." *Ort v. White*, 813 F.2d 318, 321 (11th Cir. 1987). At the same time, it is well understood that prison guards, who are charged with maintaining order and protecting inmates and staff, may use force when necessary. *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986); *Williams v. Burton*, 943 F.2d 1572, 1575 (11th Cir. 1991). Accordingly, courts must balance an inmate's right to be free from cruel and unusual punishment with a prison official's obligation to ensure a safe and secure institution. *Ort*, 813 F.2d at 321-22.

A prisoner against whom force is used to restore order demonstrates an Eighth Amendment violation "*only* if the measure taken inflicted unnecessary and wanton pain and suffering caused by force used maliciously and sadistically for the very purpose of causing harm." *Williams*, 943 F.2d at 1575 (internal quotations omitted). Whether an officer used more force than necessary to quell a disturbance or regain control of a prisoner requires courts to consider various factors, including the need for force, the extent of force used in relation to the prisoner's conduct, the threat of harm the prisoner posed to

others, whether the officer tried to "temper the severity of a forceful response," and the injuries inflicted. *Id.*; *see Whitley*, 475 U.S. at 321; *Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002). A prisoner's lack of an injury is not dispositive but can be "evidence of the kind or degree of force that was used by [an] officer." *Charles v. Johnson*, 18 F.4th 686, 700 (11th Cir. 2021) (citing *Crocker v. Beatty*, 995 F.3d 1232, 1251 (11th Cir. 2021)).

In applying the *Whitley* factors, courts should "give a wide range of deference to prison officials acting to preserve discipline and security." *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007). Corrections officials are not required to "convince every inmate that their orders are reasonable and well-thought out," and "[c]ertainly . . . are not required to do so where an inmate repeatedly fails to follow those orders." *Danley*, 540 F.3d at 1307. As such, "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." *Whitley*, 475 U.S. at 322. A case should not go to the jury "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." *Id.*

**A. Cell Extraction**

Plaintiff alleges that during the cell extraction, Defendants Shamp, Fowler, Reagor, Allen, and Lingold used excessive force by repeatedly

punching him, smashing his face onto the floor, and choking him, all while he was not resisting. Docs. 19 at 3-4, Doc. 19-1 at 3. More specifically, Plaintiff asserts all five CET Defendants punched him all over his body when they forced him onto the bunk; Defendant Fowler smashed his face onto the floor, causing his left eye to split open; and Defendant Shamp choked him "into silence" while on the cell floor. *Id.*; *see also* Doc. 57-7 at 39-41. Plaintiff also alleges Defendants Young, Covey, and Carlan failed to intervene. Docs. 19 at 3-4, Doc. 19-1 at 3. Defendants argue the *Whitley* factors demonstrate that the force used during the cell extraction was reasonable under the circumstances, that the video evidence contradicts Plaintiff's version of events, that they are entitled to qualified immunity, and that Plaintiff's injuries were only *de minimis*. Doc. 57 at 9-22.

Initially, it is undisputed that a forced cell extraction was necessary under the circumstances, as Plaintiff admits he was refusing to comply with officers' orders to submit to restraint procedures for a decontamination shower. Doc. 57-7 at 44-47. Instead, Plaintiff complains that once inside the cell, the CET Defendants engaged in discrete actions that constitute excessive force, because he was not resisting their efforts to subdue and restrain him.

The hand-held video exhibit labeled "Handheld video 1" best shows the relevant events and is largely consistent with Defendants' use-of-force reports. *See* Doc. 57-1, 58; HH-1 at 0:03:26-0:05:07; *see also* Doc. 57-6 at 13-17. First,

the video evidence and use-of-force reports contradict Plaintiff's assertion that he was not resisting the CET's efforts to restrain him. As soon as the CET entered his cell, Plaintiff moved backward, away from Defendant Shamp and his protective shield. HH-1 at 0:03:32-0:03:37. The use-of-force reports indicate Plaintiff became combative when they initially attempted to acquire a grasp of him on the back wall, which led to the struggle shifting to the left side of the cell. Doc. 57-6 at 13-17. At that point, the CET attempted to restrain Plaintiff by placing him in a prone position on top of the bunk, but Plaintiff placed his hands on the bunk, thwarting their efforts. HH-1 at 0:03:42-0:03:57. Likewise, the use-of-force reports indicate Plaintiff obtained a grasp of the bunk with both hands. Doc. 57-6 at 13-17.

Approximately twenty-five seconds passed while the CET struggled with Plaintiff on the bunk, during which Defendant Reagor's right shoulder area made movements consistent with punching, and commands were given to "let go and put your hands behind your back." HH-1 at 0:03:42-0:04:07. This is consistent with the use-of-force reports, which indicate Reagor used "palm heel and hammer fist strikes" on Plaintiff's forearms to get him to release his grasp of the bunk. Doc. 57-6 at 13-17. The video evidence contradicts Plaintiff's allegation that all five CET Defendants were punching him all over his body while on top of the bunk. Thus, his allegations are not to be credited. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different

stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Next, Plaintiff alleges Defendant Fowler smashed his face onto the floor and Defendant Shamp choked him. Based on Plaintiff's deposition testimony, these actions occurred once the CET forced him onto the ground, during which time Plaintiff claims he was not resisting. Doc. 57-7 at 39-41. But, as previously noted, the video evidence and use-of-force reports contradict Plaintiff's assertion that he was not resisting the CET's efforts to subdue him. Although the hand-held camera video did not capture the specific, individual movements of the CET Defendants and Plaintiff once the struggle moved to ground (HH-1 at 0:04:08-0:05:07), it captured the scenario sufficiently to give an objective view of what happened. *See Brown v. Smith*, 813 F.2d 1187, 1189-90 (11th Cir. 1987) ("Although [the Court] cannot pinpoint with precision the amount of force used by [Defendants], the fact that there was no more than minimal injury, that some amount of force was justified under the circumstances, and that the force was used for a legitimate security purpose persuades [the Court] that the evidence in this case raises only a 'mere dispute over the reasonableness of the particular use of force' and could not support 'a reliable inference of wantonness in the infliction of pain.'" (quoting *Whitley*, 475 U.S. at 322)).

Regardless of the inability to clearly discern what was happening inside Plaintiff's cell at the relevant time, to the extent Plaintiff's face was smashed against the floor (or had areas of his body pulled or pressed upon) such actions and resulting injuries are to be expected when a CET is forced to subdue and restrain an inmate who is being combative and physically resistant. The use of a cell extraction team necessarily involves force. *See Thomas*, 614 F.3d at 1301 n.13 ("In a cell extraction, a team of five correctional officers enter an inmate's cell and *forcibly* restrain and remove him." (emphasis added)). Lacerations to the face, bruises, and the pushing, pulling, or pressing upon an inmate's body parts are "entirely consistent" with a reactionary use of force involving a cell extraction team. *See Charles*, 18 F.4th at 700 (noting that "small scrapes, bumps, and bruises . . . are entirely consistent with a routine takedown"). Moreover, applying force to an inmate's head and/or face when attempting to subdue him on the floor of a cell is a common tactic employed by a CET to successfully restrain an inmate whose behavior necessitated the need for such force. To the extent Plaintiff's face was pressed or smashed onto to the floor while the CET continued its efforts to overcome Plaintiff's resistance and restrain him does not mean that Defendant Fowler applied force maliciously and sadistically for the very purpose of causing harm. *See Whitley*, 475 U.S. at 320-21.

Additionally, the evidence contradicts Plaintiff's allegation that Defendant Shamp choked him "into silence." As seen on the video, while the CET struggled with Plaintiff on the ground (when he claims to have been choked), Plaintiff can be heard yelling and screaming. HH-1 at 0:04:53-0:05:07. Before the CET exited Plaintiff's cell (after he claims to have been choked into silence), Plaintiff was brought to his feet and was able to stand on his own accord. When he was finally removed from his cell and escorted to the decontamination shower, Plaintiff's gait was normal, he was awake and alert, and he began announcing that he was "physically abused" by the CET, even listing out the names of the parties involved. *Id.* at 0:07:22-0:10:10. Moreover, Defendant Shamp's use-of-force report indicates that while Plaintiff was on the cell floor, Shamp placed his hands on Plaintiff's back and used his body weight to keep Plaintiff pinned down. Doc. 57-6 at 13.

Plaintiff's medical records also belie that he was choked. During his post use-of-force exam, Plaintiff was alert, oriented, responsive, and he expressed no complaints other than those documented, which included a superficial abrasion to his right eyebrow approximately 0.25cm in length; a laceration above his left eye approximately 3.5cm x 0.5cm x 0.5cm; and bruising, redness, and swelling to both his eyes. Doc. 57-3 at 2-4; 57-5 at 2, 9. He denied any other injuries or complaints. *Id.* Plaintiff's vital signs were normal, and his respirations were even and unlabored. Doc. 57-5 at 2, 9. There is no notation

that Plaintiff reported being choked to the point of "silence" or that he had marks or redness around his neck.[5] *See id.*

The Court finds that the *Whitley* factors balance in favor of the CET Defendants with respect to their efforts to subdue and restrain Plaintiff during the cell extraction. First, as Plaintiff himself concedes, a use of force was necessary, as he was refusing to comply with orders to submit to restraint procedures following the use of chemical agents. Second, the extent of the force used directly related to Plaintiff's physical resistance. When the CET entered the cell, a struggle ensued, causing them to use additional physical force to restrain Plaintiff. Defendant Reagor's use of "palm heel and hammer fist strikes" to Plaintiff's forearms was designed to get him to release his grasp of the bunk. Defendant Fowler's alleged smashing of Plaintiff's face onto the floor amounts to a common tactic used to subdue a combative and resistant inmate during an inherently physical cell extraction. And, as to Defendant Shamp's alleged choking, the evidence contradicts that such conduct occurred and instead indicates Shamp was applying his hands and body weight to Plaintiff's back in an effort to keep Plaintiff pinned down. Third, in light of Plaintiff's continuous refusal to obey orders and submit to restraints, the threat of harm

[5] Although Plaintiff complained of having bruises on his throat and a sore neck on November 20, 2022 (six days following the incident), his medical records reflect he had normal range of motion in his neck and there was no documentation of any bruises. Docs. 57-3 at 2-4; 57-5 at 36, 52, 70-71.

Plaintiff posed to others, particularly the CET, was evident. Fourth, Defendants made many attempts and used a series of techniques to gain Plaintiff's compliance before assembling the CET. Finally, Plaintiff did not suffer extensive injuries, as there was "no documentation that [Plaintiff] had a scar around his left eye, scars on his arms and shoulders[,] and loss of sleep due to the UOF [use of force] incident." Doc. 57-3 at 2-4.

Thus, focusing on "the core judicial inquiry" of "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," the record shows Defendants did not use force maliciously and sadistically but instead to maintain and restore discipline. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). On summary judgment, a plaintiff may not rely on the unsubstantiated allegations in his complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Based on the evidence presented by Defendants and Plaintiff's failure to provide any evidence other than his own uncorroborated claims, no reasonable jury could find for Plaintiff with respect to his allegations of excessive force during the cell extraction. *See generally Goodman v.*

*Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) ("[T]o defeat a motion for summary judgment, [the non-moving party] must adduce specific evidence from which a jury could reasonably find in his favor; '[t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient.'" (second and third alterations in original) (quoting *Anderson*, 477 U.S. at 252)).

In his Response, Plaintiff argues a conflict exists in Defendants' evidence insofar as Defendants Covey and Carlan averred that Plaintiff took an "offensive position" prior to the CET entering the cell, but none of the other Defendants stated as much in their respective use-of-force reports. Doc. 69 at 4; *see also* Docs. 57-9, 57-10. While true, this does not create a genuine dispute of material fact, especially in light of the video evidence capturing the initial entry and struggle between the CET and Plaintiff. As noted, prior to the CET entering the cell, Plaintiff was standing and facing forward, and when Defendant Shamp moved forward with his protective shield, Plaintiff moved backward, which led to the struggle inside the cell. HH-1 at 0:03:26-0:03:41.

Accordingly, Defendants have demonstrated the absence of a genuine issue of material fact and, as such, summary judgment is warranted for the CET Defendants on Plaintiff's excessive force claims relating to the cell extraction. Likewise, since the Court finds that Defendants Shamp, Fowler, Reagor, Allen, and Lingold's use of force during the cell extraction was not unconstitutional, Plaintiff's failure to intervene claims against Defendants

Young, Covey, and Carlan necessarily fail. *See, e.g.*, *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1357 (11th Cir. 2015) ("[A] police officer has no duty to intervene in another officer's use of force when that use of force is not excessive."). Thus, Defendants' Motion will be granted as to these claims.

**B. Decontamination Shower**

Plaintiff alleges that during the decontamination shower, Defendant Shamp smashed his head into the wall, Defendant Fowler sprayed the water hose into his mouth, and an unspecified Defendant choked him. Doc. 19-1 at 3-4. But, as previously noted, in his sworn deposition, Plaintiff explained that it was Shamp who choked him and Defendant Reagor who smashed his head into the wall, while Defendant Lingold sprayed water into his mouth. Doc. 57-7 at 41-42. This discrepancy is immaterial because the video evidence showing Plaintiff's decontamination shower clearly contradicts his version of events, such that no reasonable jury could find that Plaintiff suffered a violation of is Eighth Amendment rights. *See Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010); *see also Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (recognizing that "where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible").

The video evidence shows Plaintiff was guided into the shower stall by Shamp and Reagor, both of whom stood on either side of Plaintiff and maintained a grasp of his arms. HH-1 at 0:10:40-0:14:30. Plaintiff was facing

forward so that his face was situated away from the water hose. *Id.* While the video does not show Plaintiff's body during the shower or the entire bodies of Shamp and Reagor, it captures Shamp's and Reagor's upper bodies and shoulder areas as they stood in the stall with Plaintiff during the entire shower. Once again, the video documents the scenario sufficiently to give an objective view of what happened. Neither Shamp nor Reagor made any physical movements during the shower consistent with smashing Plaintiff's head into a wall or choking him. *Id.* To the contrary, Shamp and Reagor remained still and calm throughout the entire shower, which lasted just short of three minutes. *Id.* The camera is angled in such a way where, if Shamp and Reagor had engaged in such conduct, it would have been captured by the camera.

Additionally, the video does not support that Lingold sprayed the water hose down Plaintiff's mouth. As noted, Plaintiff was facing forward, such that his back was facing Lingold during the shower. Lingold calmly hosed down Plaintiff; Lingold remained in the camera's view the entire time, and he made no movements consistent with adjusting the water hose around Plaintiff's head in order to spray water in Plaintiff's mouth. *Id.* While Plaintiff yelled that he could not breathe at times during the shower, it is extremely plausible that such sensation stemmed from the fact that he had recently been sprayed three times with chemical agents, which are known to cause respiratory distress.

Once the water was turned off, all three officers stood calmly and still by Plaintiff until Lingold was provided a key to remove Plaintiff's leg restraints, allowing Plaintiff to put on a pair of boxers. Again, during this time, neither officer made any physical movements consistent with smashing Plaintiff's head into a wall, choking him, or spraying water into his face or mouth.

The video evidence conclusively shows that Defendants' conduct during the decontamination shower was not "sadistically and maliciously applied for the very purpose of causing harm." *Sconiers*, 946 F.3d at 1266. Instead, the video evidence shows Shamp, Reagor, and Lingold conducting a routine forced decontamination shower. Consequently, since the Court finds no constitutional violation occurred during the decontamination shower, Plaintiff's claim that Defendant Young failed to intervene necessarily fails. *See, e.g.*, *Mobley*, 783 F.3d at 1357. As such, summary judgment will be granted for Defendants as to Plaintiff's excessive force and failure to intervene claims relating to the decontamination shower.

Therefore, it is now

**ORDERED AND ADJUDGED**:

1. Defendants Young, Covey, Shamp, Allen, Reagor, Fowler, Price, and Carlan's Motion for Summary Judgment (Doc. 57), which Defendant Lingold adopts, is **GRANTED**.

2. Defendant Lingold's Motion to Dismiss (Doc. 62) is **DENIED** as moot.

3. The Clerk is directed to enter judgment in favor of all Defendants and against Plaintiff; terminate any pending motions; and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 17th day of August, 2026.

BRIAN J. DAVIS
United States District Judge

OrlP-2
C: Kevin Lamar Blake, # X83762
Counsel of record